## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RANDY JOSEPH FRICKEY**                         **CIVIL ACTION**

**VERSUS**                                       **NO. 14-1922-SM-SS**

**CAROLYN COLVIN, ACTING**
**COMMISSIONER OF SOCIAL SECURITY**

### REPORT AND RECOMMENDATION

The plaintiff, Randy Joseph Frickey ("Frickey"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, as well as his claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).

### PROCEDURAL HISTORY

On May 2, 2011, Frickey submitted applications for benefits. They were denied. R. 114. On December 23, 2011, an Administrative Law Judge ("ALJ") issued a decision finding that he had not been under a disability through the date of the decision. R. 122.

On March 19, 2012, Frickey submitted an application for benefits. He reported that he became unable to work on February 2, 2011. R. 204. An application for SSI was also completed. R. 208-210. The disabling conditions listed were osteoporosis and attention deficit hyperactive disorder ("ADHD"). R. 284. The determination was not disabled. R. 140 and 153. He was notified of the unfavorable determination on April 18, 2012. R. 154-55.

On May 14, 2013, Frickey submitted a pre-hearing brief and moved to amend for a closed period of disability from December 24, 2011, the day after the first decision, through

December 31, 2012.  Rec. doc. 198.  There was hearing before an ALJ on May 15, 2013.  R. 55-110.  At the hearing, Frickey requested a finding of current disability and alternatively for a closed period.  R. 316.

On June 28, 2013, the ALJ issued an unfavorable decision.  R. 8-26.  The ALJ found that Frickey was not under a disability through the date of the decision.  R. 21.  On June 18, 2014, the Appeals Council denied his request for review.  R. 1-6.

On August 22, 2014, Frickey filed a complaint in federal court.  Rec. doc. 1.  The parties submitted cross-motions for summary judgment.  Rec. docs. 11 and 13.  Frickey has been represented by an attorney since June 2012.  R. 160-63.

## STATEMENT OF ISSUES ON APPEAL

**Issue No. 1**.    Whether the ALJ failed to follow the proper legal standard in considering whether Frickey's impairment met § 12.05(C) of the Listings?

**Issue No. 2**.    Whether the Appeals Council erred by failing to evaluate new and material evidence properly submitted on appeal?

**Issue No. 3**.    Whether the ALJ's assessment of Frickey's limitations of concentration, persistence and pace was simplistic, conclusory, overly broad and unsupported by substantial evidence?

## THE COMMISSIONER'S FINDINGS

1.  Frickey met the insured status requirements of the Act through December 31, 2015.

2.  Frickey had not engaged in substantial gainful activity since December 24, 2011, the amended alleged onset date (20 C.F.R. §§ 404.1571 *et seq*., and 416.971 *et seq*.).

3.  Frickey had the following severe impairments:  osteoporosis; borderline intellectual functioning; and ADHD (20 C.F.R. §§ 404.1520(c) and 416.020(c), and Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985)).

4.   Frickey did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   Frickey had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c).  In addition, he was able to utilize short-term memory.  He was capable of simple instructions and 1 to 2 step processes.  He was limited to jobs where contact with supervision is limited to one time per hour, but where supervision was always available if needed.  He was able to work in the proximity of a small group of co-workers, approximately 5-10 people; however, he was unable to work with co-workers to accomplish any particular job task.  He was limited to jobs where contact with the general public was rare.  He was limited to jobs that are repetitive in nature, and where changes in job duties do not occur more than 1-2 times per month.

6.   Frickey was unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7.   Frickey was born in 1986 and was 24 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

8.   Frickey had at least a high school education and was able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9.   Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Frickey was "not disabled," whether or not he had transferable job skills (See SSR 82-14 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

3

10.   Considering Frickey's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that he could perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   Frickey had not been under a disability, as defined in the Act, from December 24, 2011, the amended alleged onset date, through the date of the decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

## ANALYSIS

a.    **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461.  Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited

function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez v. Barnhart, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

_____

[1] The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).   When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.   "In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history."  Perez v. Barnhart, 415 F.3d at 462.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

**b.**      **Hearing**.

Linda Frickey (Randy's mother), Randy Frickey and the vocational expert testified at the hearing.  R. 55.

---

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

Randy Frickey is the child of Linda and Rickey Frickey.  They live in Waggaman, Louisiana.  R. 64 and 68.  Frickey lived at home with his parents.  R. 91.

Frickey had been in special education programs.  R. 86.  He got as far as junior high, but he could not cope with school.  R. 86.  He was placed in a one-on-one tutoring class.  R. 86.  He finished the ninth grade.  R. 87.  He did not go to high school.  He obtained a GED by the computer.  R. 87.  He was in one-on-one tutoring throughout school, except kindergarten where he was in a class.  R. 87.

Frickey's father was employed as a supervisor for Marvin's Electric.  R. 66.  The business was owned by Marvin Descant.  R. 66.  Frickey worked for the business as an electrician helper for seven years.  He worked for his father almost the whole seven years.  R. 64 and 71-73.  He hooked up boxes, pulled wire, and dug trenches for pipe.  R. 64-65.

Frickey's father went on vacation.  R. 73.  Frickey was working with Wayne Galant.  R. 70 and 73.  Wayne Galant complained to Marvin Descant about Frickey.  R. 70.  Frickey was terminated by Marvin Descant because he was unable to work with anyone but his father.  R. 67.  Mavin Descant called Frickey on the phone and told him to go home because Marvin's Electric did not need him anymore.  R. 74-75.  Before he was fired, there were a lot of times when he was told that his work was not satisfactory.  R. 75-76.  They complained about the speed at which he worked.  R. 77.  Frickey had conflicts with his father on the job and they would argue.  R. 77.

Frickey's application for unemployment was denied.  R. 68.  The unemployment office told Mrs. Frickey that he was denied unemployment because Frickey was not doing the job because of his disability.  R. 69.

Mrs. Frickey contacted a friend that owned a business working with a cruise line.  R. 80.  Randy was employed to assist passengers with directions as they came on the cruise ship.  He did

this for two or three months.  R. 80-81.  He was told he was no longer needed.  R. 82.  Mrs. Frickey was told that the employer was going to use college students for the job.  They did not want to continue with Frickey because he was not friendly enough.  R. 83.

Frickey worked for about a month for Mr. Frickey's cousin doing electric work.  The cousin reported that he could not keep Frickey because he could not trust him in that line of work.  R. 83-84.  He worked for about a month doing fence work with a friend of the Frickey family.  R. 84.

Mrs. Frickey took Frickey to a vocational rehabilitation program at the Lighthouse for the Blind.  He was interviewed.  Mrs. Frickey was with him during the interview and about five appointments.  One of the trainers said he would probably be able to hold a job folding napkins in a restaurant.  They were given a list of places, where he might find work.  R. 87-91.

Frickey went to the Mental Health Center.  R. 99.

Frickey had a temper problem.  R. 84.  He had a short fuse.  R. 86.  People aggravated him.  He did not like being around them.  He had problems with his concentration.  He started things, but had difficulty finishing them.  For example, if he started cleaning he would put it off and do something else.  R. 85.  He did not respond to criticism.  R. 86.

Ms. Frickey described Frickey as child-like.  He had to have somebody to talk to all the time.  He could not comprehend and do things on his own.  R. 95.

Frickey lived with a couple of friends for a short while.  They argued a lot, so he returned home.  R. 96.  Frickey did not have a curfew.  His mom prepared meals for him, but he did not eat with his parents.  Frickey was in and out.  R. 96.  He could not cook, but he could make a sandwich or heat up a frozen dinner.  R. 97.

Frickey had a few friends, but the rest of the people he knew aggravated him.  His closest friend was his 24 year old nephew.  R. 98.  They liked to shoot pool.  Sometimes he had to sit down, because his back hurt.  R. 99.

Frickey knew how to drive.  R. 93.  He took a driver's education course.  R. 93.  His mother helped teach him how to drive.  R. 94.  He passed the written test without any help.  R. 94.  He got his license.  R. 95.

At the time of the hearing, Frickey did not have a driver's license.  R. 91.  One day he had daiquiri at about 4:00 p.m. with his cousin.  R. 93.  He was driving his father's truck.  R. 93.  He had a blow-out, hit a drain and a tree.  R. 92-93.  He was in the hospital for almost 24 hours.  R. 92.  While he was in the hospital, the police came and took his license.  He had a court date.  R.92.  At the hospital, blood was drawn for the police.  R. 93.

Based on the RFC in the ALJ's hypothetical question, the vocational expert testified that Frickey could not perform his past relevant work.  R. 102.  With the RFC there was work available, including housekeeper, building cleaner, and equipment or vehicle washer.  R. 102-03.  With the changes in the RFC proposed by his counsel, there was no work available.  R. 103-106.

c.     **Medical Evidence**.

<u>1997</u>

On April 10, 1997, Jefferson Parish Public School System ("JPPSS") reported that Frickey was learning disabled and speech impaired.  R. 476-84.  On May 13, 1997, JPPSS completed an evaluation and described him as learning disabled.  R. 473-74.

<u>2009</u>

On April 24, 2009, Frickey was seen by Rebecca Nguyen, M.D., a pediatrician.  The osteoporosis condition was stable.  R. 324-27.  On May 12, 2009, he was seen by Dr. Tilak

Mallik, M.D., an internist, on a referral from Dr. Nguyen for evaluation of osteoporosis.  R. 370.
On June 25 and July 30, 2009, he returned to Dr. Mallik.  R. 364-67.

On August 24, 2009, there was a CT scan of the neck.  The impression was mild reversal
of the normal cervical lordosis.  R. 335 and 418.  On August 24, 2009, there was a sonogram
evaluation of the thyroid gland.  There was increased vascularity within the gland.  It had an
otherwise normal appearance.  R. 336-38 and 419.

On September 29, 2009, Frickey was seen by Dr. Mallik.  R. 363.  He was also seen for a
thyroid consult.  R. 362.

2010

On January 18, 2010, Frickey was seen by Dr. Mallik.  R. 359-60.

On July 6, 2010, there was a bone density scan.  R. 331-33 and 400.  Frickey was
considered osteopenic.  R. 333 and 349.

On July 19 and November 3, 2010, Frickey was seen by Dr. Mallik.  R. 344-48 and 413.

2011

On May 4, 2011, Frickey was seen by Dr. Mallik.  R. 341-42 and 415-16.  On June 22,
2011, Dr. Mallik reported that Frickey was diagnosed with osteoporosis with a history of
multiple bone fractures.  Boniva was prescribed.  Dr. Malik advised Frickey not to lift any
weight greater than 25 pounds.  R. 373.

On August 2, 2011, Frickey underwent a psychological evaluation with Christine B.
Powanda, Ph.D., a developmental psychologist, on a referral from the Louisiana Rehabilitation
Services.  R. 380-90.  Frickey's intellectual functioning fell within the borderline range.  The test
performance may have been negatively impacted by ADHD symptoms.  He lived alone.  He had

a driver's license and traveled on his own.  He was employed as an electrician's helper with his father until February 2011.  R. 384.

The Louisiana Rehabilitation Services supplied a form entitled "Guidelines for ADD/ADHD Severe Disability," dated August 2, 2014.  Although the form is not signed, it indicates that Frickey's counselor was Myron Clark.  R. 376-79.

On November 7, 2011, Frickey was seen by Dr. Mallik.  R. 392-94.  On December 15, 2011, Frickey was seen by Dr. Nguyen for back pain.  R. 420-22.

<u>2012</u>

On March 15, 2012, there was a bone scan.  R. 427-29.

On April 18, 2012, Lynette Causey, Ph.D., and Anthony Scardino, M.D., completed the medical portion of disability determinations.  R. 431-32.

On June 3, 2012, there was an x-ray of the lumbar spine.  The impression was essentially unremarkable with trace levoscoliosis noted with some normal variation noted in the sacral region.  R. 468.

On June 13, 2012, Frickey was seen by Alfredo Vichot, M.D., a specialist in arthritic and rheumatic diseases, on a referral from Dr. Mallik.  Frickey complained of low back pain and feeling tired.  He was still able to play pool with friends at least twice a week without any significant flare-up.  He worked two to three hours a week on a cruise ship.  He took Boniva, Ibuprofen, calcium, Vitamin D and Flexeril.  The range of motion for the upper and lower extremities was normal.  He had tender points above and below the waist in a typical fibromyalgia fashion.  He was advised to take Flexeril on a regular basis.  R. 466-67.

On June 24, 2012, Frickey was seen by Leonard Culver, Ph.D., at the request of Frickey's counsel, to determine his eligibility for disability benefits.  R. 438-442.  He appeared to have a

rather severe dependent personality disorder with a long history of ADHD.   Intellectual functioning was probably in the borderline range.  He was not independent.  He had difficulty concentrating.  He would be seen as odd by co-workers.  He did not make decisions on his own. He needed a lot more supervision than would be provided most employees.  While he tolerated the testing process, he would be unable to deal with social stress common on most jobs.  R. 442.

On June 28, 2012, there was an x-ray of the thoracic spine.   There was mild disc degeneration at T6-7, T7-8 and T8-9.   There was a small disc protrusion at T6-7 without significant mass effect.  At T7-8, there was a small to slightly moderate disc protrusion without cord deformity.  R. 434.  A June 28, 2011 MRI of the lumbar spine was unremarkable.  R. 435.

On July 9, 2012, Frickey returned to Dr. Vichot.  R. 464-65.  He was able to play pool without any severe impediment.  He was going to Las Vegas to participate in a tournament.  R. 464.

> On physical exam the patient has no facial rash, parotid enlargement, episcleritis, or pain on palpation of the spinous processes of the neck.  He has no tenderness on palpation of the paraspinal region at this time.  There is no kyphosis.  ROM of the lumbar spine is good.  He has no trigger points.  There is some discomfort on palpation of the medial aspect of the knees.  There is absence of synovitis or effusions.

R. 464.

On July 27, 2012, there was a screening for mental health.  R. 459-60.

On August 6, 2012, Frickey returned to Dr. Vichot.  There was joint tenderness over the trapezii and pectoralis muscles.  There was no evidence of joint swelling or synovitis.  He had full range of motion for all joints.  The Flexeril dosage was increased.  He was to return after he got back from a Las Vegas convention.  R. 463.

On August 8, 2012, Frickey was seen with his mother by Crystal Yancy at the West Jeff Mental Health Clinic on a referral from Dr. Culver.  Frickey was referred to Julie Burke for a psychosocial assessment.  R. 458.

On August 20, 2012, a behavioral assessment was completed by Julie Burke.  R. 453-57. The results of the mental status examination were: general appearance - healthy; behavior and psychomotor activity – normal; attitude – cooperative; speech – slow; mood – depressed; affect – blunted; perceptual disturbances – none; thought process – logical/coherent; suicidal/homicidal ideation – denied current, had some feelings in junior high, but did remember that; sensorium/cognition – lethargic; remote memory – normal; recent memory – impaired; immediate recall – normal; intellectual functioning – borderline; judgment – impaired; insight – some awareness of illness/symptoms; impulse control – recent impulsive behavior; and risk of harm to self or others – low.  R. 456.

On August 24, 2012, a Level of Care Utilization System ("LOCUS") evaluation report was completed by Julie Burke.  Frickey was referred to the East Jefferson Mental Health Center. R. 448-452.

On September 24, 2012, Frickey was seen at the West Jefferson Mental Health Center and referred him to a doctor for an evaluation.  R. 447.  On October 3, 2012, he was seen by Juan Labadie, M.D., for a psychiatric evaluation.  R. 445-46.  He was put on a trial of Vyvanse.  He was to return in one month.  R. 446.

On October 8, 2012, Frickey and his mother were seen by Dr. Vichot.  R. 462.

On October 31, 2012, Frickey returned to Dr. Labadie.  He was taking his medications about every other day.  He was continued on Vyvanse.  R. 443-44.

On December 10, 2012, Frickey returned with his mother to Dr. Vichot, who reported that he did not think he needed to see him again.  He had some Tramadol and Flexeril left.  Because of the date of his last prescription, Dr. Vichot concluded that Frickey was not taking it on a regular basis.  There was no return appointment.  R. 461.

<u>2013</u>

On December 17, 2013, Frickey returned with his mother to Dr. Culver at the request of his attorney.  R. 493-95.  The diagnosis was dependent personality disorder with ADHD.  The estimate was borderline intelligence.  His condition interfered with getting along with others at a job.  He would decompensate under social stress.  His social judgment was poor.  His difficulties with concentration would interfere with keeping up the pace at most jobs.  R. 495.

**d.**      **Plaintiff's Appeal**.

**<u>Issue No. 1</u>**.      Whether the ALJ failed to follow the proper legal standard in considering whether Frickey's impairment met § 12.05(C) of the Listings.

At step three of the five step analysis, the ALJ began by determining that Frickey's osteoporosis did not meet Listing 1.04 (Disorders of the Spine).  The ALJ considered whether Frickey's mental impairments met the criteria for:  Listing 12.02 – Organic Mental Disorders; and Listing 12.05 – Intellectual Disability.

The required level of severity for Listing 12.02 is met when the requirements in both Paragraphs A and B are satisfied or when the requirements in Paragraph C are satisfied.  The ALJ determined that Frickey's mental impairments did not satisfy the criteria for Paragraph B or Paragraph C.  R. 14-15.  Thus, Frickey's impairment did not meet Listing 12.02.

The required level of severity for Listing 12.05 is met when the requirements in Paragraphs A, B, C, or D are satisfied.

Paragraph A of Listing 12.05 states:

> Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures or intellectual functioning is precluded. . . .

20 C.F.R Part 404, Subpart P, Appendix 1 – 12.05(A).  Frickey did not contend that he was unable to care for himself independently.  R. 15.

Dr. Powanda's report found Full Scale IQ of 71 and Verbal Comprehension Index of 76 (R. 382).  With these scores, Frickey needed a valid performance score of 59 or less to satisfy the criteria for Paragraph B of Listing 12.05.  Dr. Powanda's report did not contain a result for a performance test.  Frickey scored an 86 on the Perceptual Reasoning Index and 65 on the Processing Speed Index (R. 382).  Inasmuch as they comprise the performance IQ and their scores were greater than 59, the ALJ concluded that Frickey did not have a Performance Score of 59 or less.  R. 15.  He did not meet the criteria for Paragraph B of Listing 12.05.

Because the criteria for Paragraph D of Listing 12.05 are the same as Paragraph B of Listing 12.02, the ALJ's determination that Frickey's mental impairments did not satisfy the criteria for Paragraph B of Listing 12.02 meant that the criteria for Paragraph D of Listing 12.05 were not satisfied.  R. 15.

The Paragraph C criteria remain for consideration.  The ALJ stated:

> [T]he "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.   Although the claimant has another physical impairment that imposes additional significant work-related limitations, the claimant does not have a verbal, performance, or full scale IQ of 60 through 70. Accordingly, the "paragraph C" criteria of listing 12.05 are not met.

R. 15-16.

Frickey challenges the ALJ's finding that he does not have a valid performance IQ of 60 through 70.  He contends that if the ALJ's reasoning employed to determine that he did not have

15

a Performance Score of 59 or less for Paragraph B of Listing 12.05 (R. 15) is applied to the criteria in Paragraph C, the ALJ would have concluded that he has a Performance IQ of less than 70.  He urges that the Processing Speed score of 65 will pull the Performance IQ score to less than 70, particularly where the Full Scale IQ score was only 71.  Rec. doc. 11 (Memorandum at 10).

The Commissioner restates Frickey's argument but does not directly answer whether combining a Perceptual Reasoning Index score of 86 and a Processing Speed Index score of 65 produces a Performance IQ score of 60 through 70.  Rec. doc. 13 (Memorandum at 6).  The Commissioner states that Frickey's position has no merit.  Id.  Because the Commissioner does not directly refute Frickey's argument, it is assumed that he has a Performance IQ score of 60 through 70.

The Commissioner contends that even if a claimant has a valid verbal, performance or full scale IQ of 60 through 70 and has a physical or other mental impairment imposing an additional and significant work-related limitation of function, Frickey must have significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested before the age of 22 for Listing 12.05(C).  The Commissioner describes this as the threshold requirement found in the opening paragraph of Listing 12.05.

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.05.

In Randall v. Astrue, 570 F.3d 651 (5th Cir. 2009), the Fifth Circuit stated:

> We must construe Listing 12.05 and determine the precise relationship between the diagnostic description's substantive requirements ("significantly subaverage intellectual functioning with deficits in adaptive functioning"), the diagnostic

description's temporal requirement ("initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22"), and the four severity criteria (paragraphs A, B, C, and D).

Id. at 656 (footnote omitted).  The Court held that,

[T]he ALJ did not err in construing Listing 12.05 to require an independent showing of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; that is to say, the evidence demonstrates or supports onset of the impairment before age 22."

Id. at 659-60.

Assuming that Frickey meets the severity criteria for Paragraph C, he must also prove that he demonstrates significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22.  The Commissioner contends that Frickey failed to provide evidence that he satisfied this threshold requirement for Listing 12.05(C).

At the August 2, 2011 psychological evaluation, Dr. Powanda found that Frickey's intellectual functioning fell within the Borderline range.  It was noted that the test performance may likely have been negatively impacted by ADHD symptoms.  Allowing for such negative impact, Dr. Powanda opined that his potential level still likely fell within the Borderline range. R. 384.  On June 24, 2012, Culver assessed him with Borderline intellectual functioning.  R. 438-42.  Like Dr. Powanda, Dr. Culver suspected that his scores were lowered by ADHD.  Julie Burke's August 22, 2012 assessment estimated his intellectual functioning at Borderline.  R. 453-57.  On October 3 and November 19, 2012, Dr. Labadie diagnosed him with Borderline intellectual functioning. R. 444-46.

In Randall, the Fifth Circuit found that the ALJ's finding as to the claimant's adaptive functioning was backed by substantial evidence.  The ALJ was entitled to rely on the clinical

17

psychologists' analysis of the claimant's mental capabilities, including the determination that the claimant suffered from only mild/borderline adaptive retardation. 570 F.3d at 662. For Frickey every medical doctor, psychologist or clinician found that he suffered only from Borderline intellectual functioning. There is substantial evidence that Frickey did not satisfy the threshold requirement for Listing 12.05(C).

Dr. Powanda noted that Frickey had a valid driver's license. There were no significant anger control problems. He cooked his meals, mowed the lawn, and did some household chores. He shopped for groceries, clothing and personal items on his own. R. 381 and 383. No significant interpersonal problems were noted. R. 383. At the time of Dr. Powanda's evaluation, Frickey had his own home and lived alone. R. 384. Dr. Culver recorded that Frickey walked his dog. He did not require help with dressing, bathing, grooming or hygiene. While he did not know how to cook, he heated food in a microwave. He saw friends near his home. He had a girlfriend for about two months. R. 440. Dr. Vichot saw Frickey for evaluation of pains all over his body. R. 466. On July , 2012, Dr. Vichot noted that he was able to play pool without any severe impediment. He was going to Las Vegas to participate in a tournament. R. 464. On October 31, 2012, Dr. Labadie noted that Frickey was not drinking but was going to a cousin's bachelor party in a few days. R. 444. These reports are substantial evidence that Frickey did not suffer deficits in adaptive functioning.

The ALJ did not fail to follow the proper legal standard in considering whether Frickey's impairment met § 12.05(C) of the Listings.

**Issue No. 2**.  Whether the Appeals Council erred by failing to evaluate new and material evidence properly submitted on appeal?

The ALJ issued his decision on June 28, 2013. R. 22. On December 17, 2013, Frickey returned to Dr. Culver at the request of his counsel. R. 493. Frickey was tested. The result was

a Full Scale IQ of 62 with similar scores for other tests.  R. 494.  Counsel for Frickey submitted Dr. Culver's report to the Appeals Council.  R. 4.  Its decision does not make specific reference to the report other than to say it considered the evidence.  R. 1.

Frickey contends that the Appeals Council's consideration of Dr. Culver's December 17, 2013 report was insufficient.  He urges that, pursuant to a 1980 decision (Epps. v. Harris, 624 F.2d 1267, 1273 (5th Cir. 1980)), the Fifth Circuit held that the Appeals Council was required to evaluate such evidence to determine Frickey's eligibility for benefits.  The Commissioner responds that the requirement of the Appeals Council to engage in a detailed discussion of evidence was suspended by a 1995 memorandum from the Executive Director of Appellate Operations.  See Higginbotham v. Barnhart, 405 F.3d 332, 335, n. 1 (5th Cir. 2005).

Higginbotham, however, holds that the evidence submitted by the claimant to the Appeals Council should be reviewed by the district court because it is part of the record.  Id. at 337-338.  The evidence, Dr. Culver's December 2013 report, is considered only to determine whether it satisfies the criteria for remand, which are:

a. The evidence must be new and not merely cumulative of what is already in the record;

b. The evidence must be material; it must be relevant, probative, and likely to have changed the outcome of the Commissioner's determination; and

c. The claimant must demonstrate good cause for not having incorporated the new evidence into the administrative record.

42 U.S.C § 405(g); Haywood v. Sullivan, 888 F.2d 1463, 1471-72 (5th Cir. 1989).

Although Frickey did not return to Dr. Culver until after the ALJ issued his decision, Frickey was first seen by Dr. Culver on June 24, 2012.  R. 438.  The hearing before the ALJ was on May 15, 2013.  R. 55.  Frickey has not demonstrated why he could not have returned to Dr. Culver before the May 15, 2013 hearing or why he did not request that the ALJ refrain from

issuing a decision until after he presented a further report from Dr. Culver.  Frickey has not

demonstrated good cause for not having presented the report prior to the ALJ's decision.

The December 2013 report from Dr. Culver is not likely to have changed the outcome of

the Commissioner's determination.  Dr. Culver found Borderline intellectual functioning.  R.

495.  Dr. Culver suspected Frickey's scores were lowered by ADHD.  R. 495.

The Appeals Council did not err by failing to consider and evaluate Dr. Culver's

December 2013 report.  The report does not satisfy the criteria for remand.  There is substantial

evidence for the ALJ's determination that Frickey's impairment did not meet Listing 12.05(C).

**<u>Issue No. 3</u>**.    Whether the ALJ's assessment of Frickey's limitations of concentration,
persistence and pace was simplistic, conclusory, overly broad and unsupported by
substantial evidence?

For the Paragraph B criteria for Listing 12.02, the ALJ considered the degree of

restriction for: (1) the activities of daily living; (2) maintaining social functioning; (3)

maintaining concentration, persistence, or pace; and (4) episodes of decompensation.  R. 14.

With regard to concentration, persistence or pace, the claimant has moderate
difficulties.  This claimant watches television and enjoys playing video games.
However, the claimant reported a limited attention span.

R. 15.

Frickey argues that:  (1) the ALJ's conclusion as to his concentration difficulties was

solely based on the fact that he watched television and enjoyed playing video games; (2) the ALJ

ignored the results of Dr. Powanda's testing indicating that he scored extremely low on working

memory and processing speed which measure elements of concentration, persistence, or pace;

and (3) other findings, for example Dr. Powanda's observation of Frickey's difficulty with

sustained attention to tasks and distractibility (R. 383), corroborated these measurements.

Frickey argues that:   (1) the objective measures equated to a marked impairment in

concentration, persistence, or pace; (2) they refuted the ALJ's RFC finding that he could utilize short term memory; and (3) the finding that he had moderate difficulties with concentration, persistence, or pace was not supported by substantial evidence.  Rec. doc. 11 (Memorandum at 13-15).

In analyzing the four elements of Paragraph B of Listing 12.02, the ALJ found:

1. A mild restriction in the activities of daily living.

2. Mild difficulties in maintaining social functioning.

3. Moderate difficulties in maintaining concentration, persistence, or pace.

4. No episodes of decompensation of extended duration.

R. 14-15.  Assuming that Frickey's argument is correct and the only possible conclusion based on the evidence is that he had marked difficulties in maintaining concentration, persistence, or pace, the result at step 3 would not be any different.  Paragraph B of Listing 12.02 requires at least two of the following:

1. Marked restriction in the activities of daily living.

2. Marked difficulties in maintaining social functioning.

3. Marked difficulties in maintaining concentration, persistence, or pace.

4. Repeated episodes of decompensation of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1 – 12.02(B).  Even with marked difficulties in maintaining concentration, persistence, or pace, Frickey had only one of the criteria identified in Paragraph B.  He did not satisfy the Paragraph B criteria of Listing 12.02.

The other part of Frickey's argument is that the ALJ's inclusion in the RFC of the statement that he was "able to utilize short-term memory. . . ." was refuted.  R. 16 and Rec. doc. 11 (Memorandum at 14).

After concluding that the mental impairments did not satisfy the Paragraph B criteria for Listing 12.02, the ALJ commented that: (1) the limitations identified for the Paragraph B criteria are not a RFC assessment; (2) the mental RFC assessment at steps four and five of the sequential evaluation process required "a more detailed assessment. . .;" and (3) the RFC assessment reflected the degree of limitation found in the Paragraph B mental function analysis. R. 15. In the RFC the ALJ described nonexertional limitations (R. 16), which the ALJ said accommodated the legitimate limitations Frickey may have in terms of simple, routine tasks and interacting with others (R. 20). The ALJ's nonexertional limitations in the RFC include "claimant is able to utilize short-term memory. He is capable of simple instructions, and 1-2 step processes." R. 16.

The ALJ noted that: (1) on June 24, 2012, Dr. Culver reported that Frickey was able to follow a four-step command (R. 18 and 441); (2) Dr. Powanda found that Frickey was able to follow verbal and simple written directions and express himself verbally in an adequate manner (R. 19 and 383); and (3) Frickey did not seek mental health treatment until after a referral from his counsel. R. 19. This last point was among the factors cited by the ALJ in assigning Dr. Culver's opinion only some weight. R. 19.

Dr. Culver's June 24, 2012 report also noted that Frickey repeated five digits forward and two backward. He was not distracted by extraneous noises in the hall. R. 442. Julie Burke's August 22, 2012 assessment found his recent memory impaired, but his immediate recall was normal. R. 456. Dr. Labadie's October 3, 2012 report found his concentration fair and his memory intact. R. 444.

There is substantial evidence in the record for the ALJ's findings on the nonexertional limits on Frickey's RFC, including those related to memory, concentration, persistence or pace.

## RECOMMENDATION

IT IS RECOMMENDED that: (1) the Commissioner's cross-motion for summary judgment (Rec. doc. 13) be GRANTED; and (2) Frickey's motion for summary judgment (Rec. doc. 11) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 11th day of May, 2015.

_____
**SALLY SHUSHAN**
**U.S. Magistrate Judge**